### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

**LUIS ANGEL PEREZ-PLAZA**,
    Petitioner,

v.

**COMMISSIONER OF SOCIAL SECURITY**,
    Defendant.

Civil No. 19-1145 (BJM)

### OPINION AND ORDER

Luis Angel Perez-Plaza ("Perez") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that he is not entitled to disability benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Perez contends, inter alia, that the administrative law judge ("ALJ") improperly weighed the opinion evidence in assessing his residual functional capacity (RFC) and failed to secure a required consultative examination. Docket No. ("Dkt.") 11. The Commissioner opposed. Dkt. 16. This case is before me by consent of the parties. Dkt. 19, 20. For the reasons set forth below, the Commissioner's decision is **VACATED** and **REMANDED**.

### STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through

which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Perez v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989).

Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following facts are drawn from the transcript ("Tr.") of the record of proceedings.

Perez was born on September 26, 1975. Tr. 435. He completed his high school education as well as some paramedic training and worked as a gas station attendant and paramedic. Tr. 42, 91. Over time, he developed various health problems, including back pain, high blood pressure, anxiety, and depression. *See, e.g.*, Tr. 215, 223, 285. In May 2013, Perez stopped working after a workplace accident injured his knee. Tr. 44-45, 235.

On March 11, 2014, Perez applied for disability benefits, claiming an onset date of May 17, 2013. Tr. 435. The Commissioner denied Perez's claim initially, on reconsideration, and after

a hearing before an ALJ. Tr. 21, 32. The record before the Commissioner, which included medical evidence and Perez's self-reports, is summarized below.[1]

In a function report dated May 27, 2014, Perez explained that he suffered from back, sciatic, and knee pain that limited his movement and activities. Tr. 81-88. He reported limitations related to lifting, squatting, bending, standing, walking, sitting, kneeling, and stair climbing, among others. Tr. 86. Perez explained that pain limited the amount of time he could sit or stand, and he could only walk five to ten minutes before he would need to stop and rest. Tr. 86. He reported living in a house alone, which he left for medical appointments and to visit his mother and aunt. Tr. 81-82, 85. Perez did not take care of other people or animals, and he could neither cook for himself nor perform household chores. Tr. 82-83. Family members performed these tasks for him. Tr. 83-84. He also explained that he could not bend to put on clothes or bathe himself. Tr. 82. Sitting down and standing up to use the toilet caused him a lot of pain, though he had no trouble shaving. Tr. 82.

Medical records show that Perez sought treatment for damage to his knee, back pain, and high blood pressure. From May 2013 to October 2015, Perez sought treatment through the State Insurance Fund ("the Fund"). At his initial physical examination, Perez reported that he had slipped

---

[1] The record contains evidence of both physical and mental impairments. However, Perez has only raised arguments related to his physical ailments, specifically those that cause pain. Accordingly, I do not refer to the evidence related to his mental impairment.

Additionally, much of the record evidence post-dates Perez's date last insured. I summarize that evidence here insofar as it sheds light on the question of disability within the coverage period. *See Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 193 (1st Cir. 1987) (explaining that "the ALJ is entitled to consider evidence from a prior denial for the limited purpose of reviewing the preliminary facts or cumulative medical history necessary to determine whether the claimant was disabled at the time of his second application"); *Patoski v. Berryhill*, 320 F. Supp. 3d 283, 291 (D. Mass. 2018), *aff'd*, No. 18-1904, 2019 WL 2574591 (1st Cir. June 24, 2019) (quoting *Rivera v. Sec'y of Health & Human Servs.*, 19 F.3d 1427 (1st Cir. 1994) (unpublished table opinion)) ("The ALJ may consider medical evidence after the DLI 'for what light (if any) it sheds on the question whether claimant's impairment(s) reached disabling severity before claimant's insured status expired.'"); *see also Davidson v. Colvin*, 164 F. Supp. 3d 926, 941–42 (N.D. Tex. 2015) (collecting cases); *Wilson v. Colvin*, 17 F. Supp. 3d 128, 139–40 (D.N.H. 2014) (collecting cases); *Casull v. Comm'r of Soc. Sec.*, No. CV 16-1620 (MEL), 2017 WL 5462185, at *4–5 (D.P.R. Nov. 14, 2017) (permitting medical evidence outside the coverage period but finding that medical evidence pre-dating the alleged onset date by more than ten years did not support plaintiff's claim of severe impairment).

at work, hitting himself in the right leg and knee, and that he was suffering from pain in his right foot and low back. Tr. 235. He described his pain as a four to six out of ten, and he had edema and bruising in the right knee and leg. Tr. 235. Perez's movements and morphology were normal, and he had no neurological deficits. Tr. 232. He was diagnosed with high blood pressure, right knee trauma, and lumbosacral strain; prescribed Toradol and Capoten; placed on rest; and referred to a physiatrist. Tr. 233. Various tests were ordered, and he left the facility walking. Tr. 415.

A lumbar x-ray taken May 20, 2013 showed straightening of the lumbar lordosis; intervertebral disc spaces narrowed at L4-L5 and L5-S1; and multilevel and small anterior and marginal osteophytes on the basis of mild spondylosis. Tr. 231. The sacroiliac joints appeared unremarkable. *Id.* On May 21, an MRI of the right knee showed a torn ACL, bone contusion, significant swelling, effusion, and mild degenerative changes. Tr. 230, 706. A lumbar MRI taken May 30 showed straightening of the lumbar lordosis, intervertebral disc spaces diffusely narrowed except at L2-L3 and L3-L4; diffuse disc desiccation; multilevel anterior osteophytes; a posterior disc osteophyte complex at T12-L1 and L1-L2 resulting in mild to moderate ventral thecal sac compression; a broad base disc bulge with associated left paracentral and foraminal disc protrusion at L4-L5 causing narrowing of latent recess and neural foramen; and a broad base disc osteophyte complex resulting in moderate ventral thecal sac compression and bilateral neural foraminal narrowing at L5-S1. Tr. 229. The impression was straightening and multilevel degenerative disc disease. *Id.*

Perez sought treatment with various professionals through the Fund, including physical therapists, a physiatrist, an orthopedic surgeon, and an occupational physician. Tr. 188, 220, 223, 225, 227. On June 20, Dr. Rolando Colon Nebot ("Dr. Colon"), an orthopedic surgeon, noted that Perez had a residual hematoma with proximal tibia exostosis in the right knee and diagnosed Perez with an ACL tear, degenerative changes in the knee, and discogenic lumbar disease. Tr. 223. Dr. Renier Mendez de Guzman administered three injections for sacroiliac joint and/or low back pain radiating to the right leg on September 19, October 3, and November 4. Tr. 215, 217-18. Perez tolerated these injections well and could walk adequately afterward. *Id.* He continued on rest status.

Tr. 181, 207-13. Doctors at the Fund prescribed various medications, including Anaprox, Capoten, Norflex, Percogesic, Neurontin, and Pasmol. Tr. 208, 221, 233.

On April 8, 2015, Perez underwent a right knee arthroscopy, which he tolerated well. Tr. 197-98. He was prescribed a post-operative knee brace and crutches. Tr. 196, 201. On June 9, an orthopedic surgeon advised he stop using those assistive devices. Tr. 192. On August 24, an occupational physician noted that Perez could not flex his knee completely. Tr. 380. He observed right knee edema and recorded 90-degree knee flexion and 15-degree extension. Tr. 380. On August 27, Dr. Colon examined Perez's knee, finding no effusion, a range of motion from 0 to 110 degrees, and stable collateral and cruciate ligaments. Tr. 184. He recommended discharge from orthopedics with disability. *Id.*

On October 27, Perez was discharged from the Fund's care with disability based on intra-articular knee tear, intervertebral disc disorders, knee contusion, and lumbosacral strain. Tr. 181. Dr. Carlos E. Arias Mendez ("Dr. Arias") opined that Perez had a permanent ten percent loss of general functions due to lumbosacral strain as well as a permanent ten percent loss of general functions due to losing one leg after amputation at or below the right knee.[2] Tr. 182. Dr. Arias also reported that Perez had diminished torso and knee flexion and suffered from radiculopathy and residual herniated nucleus pulposus. *Id.*

On three occasions, Perez sought emergency treatment at the Lares Health Center ("LHC"). On April 17, 2013, he sought treatment for pain in the back and right leg, which he described as sharp, burning, and permanent. Tr. 166. A venipuncture was performed, and Perez was discharged without pain. Tr. 166-67. On February 23, 2014, Perez visited LHC after falling from a vehicle and injuring his forehead, nose, right arm, and knee. Tr. 157. He also reported significant permanent back pain, describing his pain as an eight out of ten. Tr. 159. A doctor diagnosed multiple lacerations and lumbago and prescribed Toradol, Norflex, and Decadron. Tr. 157, 160. Perez was stable without complaint at discharge. Tr. 160. Spinal imaging taken two days after Perez's

---

[2] Other than Dr. Arias's opinion, the record is largely silent regarding the amputation of Perez's leg, offering few clues as to when this occurred.

discharge showed degenerative disc disease at L5-S1 and to a lesser extent at L4-L5, evidenced by disc space narrowing. Tr. 714. Perez returned to LHC on May 15, 2014 for back pain. Tr. 150. He described his pain as sharp, burning, and permanent, and reported that it affects his sleep and concentration. Tr. 152. He rated his pain a two to three out of ten. Tr. 152. A physician described Perez's upper and lower extremities as normal but reported pain on palpation in the lumbar area. Tr. 150. He was prescribed various medications and discharged without pain. Tr. 150, 153.

Perez also sought treatment for back and knee pain, among other ailments, with Dr. Ivette Lebron Nieves ("Dr. Lebron"). Tr. 270-317. On September 13, 2013, Perez visited Dr. Lebron complaining of pain that was an eight out of ten. Tr. 285. He was suffering from cervical, thoracic, lumbar, and joint pain, as well as depression, anxiety, and insomnia. Tr. 285. Dr. Lebron noted right knee edema as well as flexion and extension movement limitations in the back. Tr. 285. She diagnosed Perez with high blood pressure, urinary tract infection, hyperlipidemia, osteoarthritis, anxiety disorder, and right knee pain, and she prescribed Hyzaar, Septra, Lipitor, and cardiovascular exercises. Tr. 285. Dr. Lebron again found back flexion and extension limitations on May 30 and October 3, 2014. Tr. 282-83. However, at several other appointments, she recorded no gross deviation or tenderness of the back, full back flexion, and no limited seating. Tr. 275-80, 282, 284. Regarding Perez's right knee, Dr. Lebron recorded edema and movement limitations on May 30, 2014, Tr. 283; pain in both knees at flexion on March 6, 2015, Tr. 281; and partial immobilization on April 22 and August 12, 2015, Tr. 279-80. Other appointments indicate that Perez had a full range of motion in his extremities. Tr. 276-77, 282.

Imaging taken in 2016 revealed ongoing abnormalities. Lumbar imaging completed on July 21 showed various disc bulges and herniations, annular tear compressing a nerve ganglion, markedly severe neural foraminal narrowing, straightening of the lumbar lordosis, multilevel degenerative disc disease with disc desiccation, and loss of disc height, among other problems. Tr. 892-92. On October 11, a lumbosacral spine series showed degenerative disc disease at L5-S1 and small anterior and marginal osteophytes, with normal sacroiliac joints. Tr. 791. Cervical spine imaging showed straightening of the vertebral bodies of the cervical spine most likely related to

muscle spasm without acute fracture or subluxation. Tr. 789. Right knee imaging showed osteoarthritis of the right knee and postsurgical changes. Tr. 790.

Notes from a physical therapy appointment on December 19, 2016 show that Perez continued suffering from strong neck and back pain as well as muscle spasms. Tr. 433. He performed well on balance tests while seated, standing, and walking, and he could sit for 20-25 minutes and stand for 15 minutes. Tr. 434. He could walk well, slowly with a cane. Tr. 434. Although he could decrease his pain and spasms with therapy, his pain remained a nine out of ten at the end of therapy. Tr. 434. He had a limited range of motion in the neck and shoulders and difficulty holding heavy objects and performing activities of daily living. Tr. 434.

On June 3, 2014, non-examining state agency physician Dr. Rafael Queipo ("Dr. Queipo") reviewed the record and found as follows: "There is no [medical evidence] to support severity related to a [medically determinable impairment] by [the date last insured] of 12/31/2013 [sic] therefore no [medically determinable impairment] established." Tr. 437-38. On October 20, 2014, non-examining state agency physician Dr. Pedro Nieves ("Dr. Nieves") determined that Perez suffered from lumbar discogenic disease, but he found insufficient evidence in the file to assess Perez's case, as there had been no comprehensive physical examination prior to Perez's date last insured. Tr. 446.

On April 7, 2017, Perez appeared for a hearing before an ALJ. Tr. 37-60. He testified that he had been unable to work since a workplace accident in May 2013. Tr. 44. His knee had to be replaced, he was prescribed a cane, and he suffers from back pain and shoulder pain. Tr. 44-45, 49, 51. He explained that he cannot work or bend down and does not sleep well due to pain. Tr. 49. A vocational expert ("VE") also testified. Tr. 54-59.

The ALJ announced his decision on May 16, 2017. Tr. 32. He determined that Perez had not engaged in substantial gainful activity from May 17, 2013 (his alleged onset date) through December 31, 2014 (his date last insured). Tr. 23. He found that Perez had the following severe impairments: degenerative disease of the lumbar spine, right knee ligament tear, and panic disorder. Tr. 23. The ALJ also found that Perez's hypertension was not severe. Tr. 23. None of

Perez's impairments met or equaled a listing. Tr. 24. The ALJ then determined that Perez could perform medium work[3] except he could lift, carry, push, or pull twenty-five pounds occasionally or frequently; sit for six hours of an 8-hour workday; stand for two hours of an 8-hour workday; walk for two hours of an 8-hour workday with a need to alternate positions every two hours; perform work that requires no operation of foot controls with the right foot and occasional operation of foot controls with the left foot; climb ramps and stairs occasionally but never ladders, ropes, or scaffolds; stoop frequently; balance occasionally; never kneel, crouch, or crawl; and never operate a motor vehicle. Tr. 25-26. In reaching this conclusion, the ALJ considered laboratory results, medical visits, and Perez's self-reports. Tr. 26-29. He found that Perez's medically determinable impairments could produce his alleged symptoms—including back and knee pain—but that Perez's statements about the intensity, persistence, and limiting effects of those symptoms were inconsistent with other record evidence. Tr. 27. The ALJ also considered the opinions of the state agency medical consultants but gave them little weight because they were inconsistent with the record and based on a small portion of the later-developed record. Tr. 29. He also gave little weight to Dr. Arias's medical opinion, crediting it only "to the extent it is consistent with the overall evidence demonstrating that [Perez] has severe physical impairments causing some physical limitations." Tr. 29. Next, the ALJ determined that Perez was unable to perform his past work as a paramedic and gas station attendant, but, based on VE testimony, he could perform work as an inspector of missing parts, a parts assembler, or an electrode cleaner. Tr. 31. Accordingly, the ALJ found that Perez was not disabled under the Act.

    The Appeals Council denied review, Tr. 1, and this action followed.

---

[3] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). Someone who can perform medium work can also perform sedentary and light work.

## DISCUSSION

Perez's arguments are difficult to follow, particularly because he makes almost no reference to the evidence.[4] This approach risks forfeiture of any argument. *See Harriman v. Hancock Cnty.*, 627 F.3d 22, 28 (1st Cir. 2010) ("'It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'") (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)); *Redondo–Borges v. Dept. of Housing and Urban Development*, 421 F.3d 1, 6 (1st Cir. 2005) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Nonetheless, Perez raises some arguments meriting further discussion, namely that the ALJ improperly weighed the opinion evidence, substituting his own opinion for that of the medical experts, and that he should have ordered a consultative examination.

Where, as here, an ALJ reaches step five of the sequential evaluation process, the burden of proof shifts to the Commissioner to show that a claimant can perform work other than his past relevant work. *Ortiz*, 890 F.2d at 524. The record must contain positive evidence to support the Commissioner's findings regarding the claimant's RFC to perform such other work. *See Rosado v. Secretary of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

RFC is the most a claimant can do despite limitations from his impairments. 20 C.F.R. § 404.1545(a)(1). The RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function

---

[4] Portions of counsel's memorandum also appear to refer to a different case. For instance, counsel seems to believe that the ALJ found that Perez could perform the full range of light work, lift and carry a maximum of twenty pounds and ten pounds frequently, and that he could sit for two hours out of an 8-hour workday. Dkt. 11 at 4. This is incorrect. The ALJ found that Perez could perform a limited range of medium work; lift, carry, push, or pull twenty-five pounds occasionally or frequently; and sit for six hours in an 8-hour workday. Tr. 25-26. Counsel also writes as follows: "[i]n this case, given the lack of record support for the finding that Mr. Mangini can perform the full range of sedentary work, the ALJ improperly substituted his own opinion for those of the medical experts." Dkt. 11 at 5. It is not clear who Mr. Mangini is or why counsel refers to him.

in the workplace." *Id.* When measuring a claimant's capabilities, "an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person." *Santiago v. Sec'y of Health & Human Servs.*, 944 F.2d at 7 (1st Cir. 1991). The reason for requiring an expert's RFC assessment is that generally, "an ALJ, as a lay person, is not qualified to interpret raw data in a medical record." *Manso–Pizarro*, 76 F.3d at 17 (per curiam); *see also Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990) (per curiam) ("[S]ince bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record."). The ALJ may not substitute his "own impression of an individual's health for uncontroverted medical opinion." *Carrillo Marin v. Sec'y of Health & Human Servs.*, 758 F.2d 14, 16 (1st Cir. 1985). "This principle does not mean, however, that the [Commissioner] is precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as the [Commissioner] does not overstep the bounds of a lay person's competence and render a medical judgment." *Gordils*, 921 F.2d at 329.

Here, the ALJ determined that Perez could perform medium work with the following exceptions: he could lift, carry, push, or pull twenty-five pounds occasionally or frequently; sit for six hours of an 8-hour workday; stand for two hours of an 8-hour workday; walk for two hours of an 8-hour workday with a need to alternate positions every two hours; perform work that requires no operation of foot controls with the right foot and occasional operation of foot controls with the left foot; climb ramps and stairs occasionally but never ladders, ropes, or scaffolds; stoop frequently; balance occasionally; never kneel, crouch, or crawl; and never operate a motor vehicle. Tr. 25-26. In reaching this conclusion, the ALJ gave little weight to the state agency medical consultants, finding them inconsistent with the other evidence and based on a small portion of the later-developed record, and he gave little weight to Dr. Arias's medical opinion, crediting it only "to the extent it is consistent with the overall evidence demonstrating that [Perez] has severe physical impairments causing some physical limitations." Tr. 29. In other words, there is no medical opinion in the record to which the ALJ gave great or even partial weight.

Of course, this alone does not render the ALJ's decision unsupported by substantial evidence. Rather, as the Commissioner correctly points out, "[i]n this circuit, picking and choosing among experts' opinions does not in itself constitute error." *Howard v. Astrue*, No. 06-96-B-W, 2007 WL 951389, at *5 (D. Me. Mar. 27, 2007), *report and recommendation adopted*, No. CIV. 06-96-B-W, 2007 WL 1146578 (D. Me. Apr. 16, 2007) (citing *Evangelista v. Secretary of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987) ("The basic idea which the claimant hawks—the notion that there must always be some super-evaluator, a single physician who gives the factfinder an overview of the entire case—is unsupported by the statutory scheme, or by the caselaw, or by common sense, for that matter. Though it is sometimes useful to have such testimony presented, we decline to lay down an ironclad rule that, without it, a judge is powerless to piece together the relevant medical facts from the findings and opinions of multiple physicians.").

Nonetheless, having reviewed the record, I find that it does not contain a useful assessment of Perez's physical limitations. Dr. Queipo found that there was too little evidence to show that Perez suffered from a severe medically determinable impairment. Tr. 437-38. Dr. Nieves determined that Perez suffered from lumbar discogenic disease, but he found insufficient evidence in the file to assess Perez's case, as there had been no comprehensive physical examination prior to Perez's date last insured. Tr. 446. Dr. Arias, who treated Perez, offered a limited, retrospective opinion as to Perez's abilities. He opined that Perez had a permanent ten percent loss of general functions due to lumbosacral strain, a permanent ten percent loss of general functions due to leg amputation, and diminished torso and knee flexion. Tr. 182. But none of these experts provided an opinion bearing on Perez's specific functional limitations.

Even so, the ALJ reached an RFC determination by relying on laboratory findings, treatment records, and Perez's self-reports. But a layperson could not rely solely on this information to reach a reasoned determination regarding Perez's functional limitations. A May 2013 lumbar x-ray showed straightening of the lumbar lordosis, disc space narrowing, and marginal osteophytes. Tr. 231. An MRI corroborated these findings in addition to showing diffuse disc desiccation, a disc bulge at L4-L5, bilateral neural foraminal narrowing at L5-S1, and

degenerative disc disease. Tr. 705. A May 2013 MRI of the right knee showed a torn ACL, bone contusion, significant swelling, effusion, and mild degenerative changes. Tr. 230, 706. And February 2014 spinal imaging showed degenerative changes of the lumbosacral spine. Tr. 714. Treatment records showed that Perez sought ongoing treatment for back and/or knee pain, as he received three pain blocking injections in his back, Tr. 215, 217-18, visited the emergency room for back pain on three occasions, Tr. 150-167, underwent a right knee arthroscopy, Tr. 197-98, and was prescribed various medications, Tr. 157, 160, 208, 221, 233. Medical records also show that, at times, Perez's movements and morphology were normal, Tr. 232, 282, 284, while at other times his back flexion and extension were limited, Tr. 282-83. As lay persons, neither I nor the ALJ can glean much from these records regarding the precise extent of Perez's physical limitations. *See See Combs v. Berryhill*, 878 F.3d 642, 647 (8th Cir. 2017) (explaining that an ALJ could not permissibly rely "on his own interpretation of what 'no acute distress' and 'normal movement of all extremities' meant in terms of [a claimant's] RFC"); *Rosado*, 807 F.2d at 293–94 (explaining that medical findings in the record that merely diagnosed exertional impairment without relating those diagnoses to specific residual functional capabilities were "unintelligible to a lay person in terms of residual functional capacity"). Common sense does not tell us whether someone with degenerative disc disease, variable pain, and intermittent flexion and extension limitations can lift twenty-five pounds, sit for six hours of an 8-hour workday, or stoop frequently. The Commissioner's own regulations usefully illustrate this point:

> Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone; e.g., someone with a low back disorder may be fully capable of the physical demands consistent with those of sustained medium work activity, but another person with the same disorder, because of pain, may not be capable of more than the physical demands consistent with those of light work activity on a sustained basis.

20 C.F.R. § 416.945(e). To understand how Perez's disorders limited his functioning capacity, the ALJ needed to hear from a medical expert who could translate his impairments into functional terms. But the record lacks such an opinion.

Under these circumstances, the ALJ should have secured a consultative examination and otherwise developed the record. Although the claimant bears the burden of proof on the question of disability, the Commissioner "retains a certain obligation to develop an adequate record from which a reasonable conclusion can be drawn." *Carrillo Marin v. Sec. of Health and Human Services*, 758 F.2d 14, 17 (1st Cir. 1985). Thus, if the Commissioner "is doubtful as to the severity of [a claimant's] disorder the appropriate course is to request a consultative evaluation, [] not to rely on the lay impressions of the ALJ." *Id.* (citing 20 C.F.R. § 404.1517); *see also* 20 C.F.R. § 404.1519a(b) (explaining that the Commissioner may purchase a consultative examination "when the evidence as a whole is insufficient" to decide the claim). Here, the record was replete with evidence of both a back and knee disorder causing pain but lacking a medical opinion describing the specific ways in which those disorders limited Perez's functioning. Indeed, both non-examining physicians found the record devoid of relevant evidence, and Dr. Nieves specifically explained that he could not assess Perez's lumbar discogenic disease, as the record lacked any comprehensive physical examination. Tr. 446. To come to a reasonable conclusion regarding Perez's physical limitations, the ALJ required additional evidence, including a consultative examination. *See Johnson v. Commissioner of Social Security*, 351 F. Supp. 3d 286, 293, (W.D. N.Y. 2018) (ALJ should have secured a consultative examination where medical records lacked information relevant to the type of functional limitations needed to assess a physical RFC and no acceptable medical sources provided an opinion regarding claimant's physical RFC); *Shaneena W-M v. Berryhill*, 2019 WL 4193416, at *8 (S.D. Cal. 2019), *report and recommendation adopted*, 2019 WL 4688798 (S.D. Cal. 2019) (where record lacked an opinion from any treating or examining physician regarding plaintiff's work-related limitations caused by her severe mental impairment or any mental RFC assessment, ALJ's failure to order consultative examination was error requiring remand).

In short, the ALJ's RFC determination is not supported by substantial evidence because the extent of Perez's functional limitations is not discernible to a lay person and the record lacks any

medical opinion usefully translating Perez's impairments into functional terms. Further, failure to develop the record requires remand.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **VACATED** and **REMANDED** for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 4th day of March, 2021.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge